IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KELLY NEWMAN § | | |
|     Plaintiff § | | |
| § | | |
| v. § | CIVIL ACTION NO. 4:16-cv-2626 | |
| § | | |
| TEXAS PARKS AND WILDLIFE § | | |
| DEPARTMENT § | | |
|     Defendant § | JURY DEMANDED | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Kelly Newman, Plaintiff, files this Original Complaint, complaining of the Texas Parks and Wildlife Department, and for his cause of action, respectfully shows the following:

## I.
## INTRODUCTION

1. This action seeks equitable relief, actual damages, compensatory damages, attorney's fees, expert witness fees, taxable costs of court, pre-judgment and post-judgment interest for unlawful retaliation suffered by Plaintiff in the course of his employment with the Defendant.

2. Plaintiff's cause of action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.

3. Plaintiff demands a jury on all issues triable to a jury.

## II.
## PARTIES

4. Plaintiff, Kelly Newman, is a resident of Harris County, Texas.

5. Defendant Texas Parks and Wildlife Department may be served with process through its Executive Director, Carter Smith, at 4200 Smith School Road, Austin, Texas 78744.

6. Whenever in this Complaint it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

### III.
### JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 since Plaintiff is bringing this claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. The Court has personal jurisdiction over Defendant since it maintains sufficient minimum contacts with the State of Texas.

8. Venue is proper in the Southern District of Texas, under 28 U.S.C. § 1391(b) since the events or omissions giving rise to this cause of action occurred in the Southern District of Texas.

9. This Court has jurisdiction over all claims in this action.

## IV.
## PROCEDURAL REQUISITES

10. On September 2, 2014, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, Civil Rights Division under Charge Number 460-2014-03918 asserting unlawful race discrimination and retaliation pursuant to the Texas Labor Code and Title VII.

11. On September 24, 2014, Plaintiff filed an Amended Charge of Discrimination, notifying the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, Civil Rights Division of his unlawful termination that had occurred on September 17, 2014.

12. On May 31, 2016, the EEOC issued Plaintiff his Notice of Right to Sue.

13. This lawsuit has been filed within (90) days of Plaintiff's receipt of the Notice of Right to Sue letter.

14. All conditions precedent to filing this cause of action have been met.

## V.
## FACTS

15. Kelly Newman began working as a game warden for The Texas Parks and Wildlife Department ("TPWD") in 1985.

16. In his position as a game warden, Newman was a commissioned peace officer for the State of Texas.

17. Historically, the TPWD has demonstrated a pattern of discriminating against African-Americans in its employment practices.

18. For example, while TPWD has been a state agency for approximately 50 years, during that time, only 1% of the Game Wardens hired have been African-American.

19. During their employment, other non African-American game wardens have noticed the pattern of unlawful discrimination occurring against the African-American employees.

20. For example, John Rao, a Caucasian Game Warden, commented to his former captain, Albert Lynch, about how he noticed the improper treatment of African-American Game Wardens by TPWD.

21. Rao was advised by his former Captain, Albert Lynch, to distance himself from Plaintiff, Kelly Newman, and not to work with him anymore because he is African-American.

22. Rao protested Captain Lynch's advice and explained to Captain Lynch that he did not mind working with Warden Newman.

23. Warden Rao chose to work with Warden Newman during his employment.

24. Rao also assisted Newman with his Charge and provided him with information regarding the procedures for filing a Charge, as well as evidence to support his Charge.

25. Once TPWD learned that Rao had assisted Newman with filing his Charge with the EEOC, TPWD retaliated against Rao for assisting him.

26. As a result, Warden Rao subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission against the TPWD.

27. Since the time Rao filed his Charge of Discrimination in 2007, Rao was subjected to additional retaliation by TPWD.

28. For example, since the time Rao filed his Charge of Discrimination in 2007, he was repeatedly denied promotions for which he was eminently qualified, and for which he was clearly the best qualified applicant.

29. Regarding one of the positions, Rao was told by the Assistant Chief that Rao had not done anything wrong in the interview, but Rao "had filed that complaint."

30. At the time of that conversation, Kelly Newman was riding with Rao and heard the conversation between Rao and the Assistant Chief.

31. On September 16, 2010, Rao filed a Charge of Discrimination alleging retaliation against TPWD.

32. On August 19, 2011, while Rao's Charge of Discrimination was still pending at the EEOC, Captain Nick Harmon, who acted as Interim Captain for the Harris County District after Albert Lynch resigned, held a district meeting.

33. During this meeting, Captain Harmon boldly stated that the other districts call the Game Wardens in Rao's district "malcontents" and "complainers."

34. Mr. Harmon also said that going forward, anyone who complains, "Austin will have paperwork ready for your release."

5

35. On September 1, 2011, Rao applied for the Captain Position in Harris County, which was formerly held by Albert Lynch.

36. Rao interviewed for the Captain position along with nine other candidates.

37. Notably, Major Skeen, who had been the subject of Rao's 2007 Charge of Discrimination, was a panelist on the interview panel for the Captain Position.

38. Rao was denied the promotion to Captain.

39. Instead, Fred Ruiz was selected for the promotion to Captain.

40. On September 1, 2012, Rao was assigned to report to Waller County at 6:00 a.m. for the opening of dove hunting season.

41. Rao joined Captain Ruiz and four other game wardens to cover the opening of dove hunting season.

42. With the exception of John Rao, all of the game wardens were issued All-Terrain Vehicles ("ATVs") to use.

43. Rao was instructed to patrol the fields on foot, even though everyone else was allowed to patrol the fields on the ATVs.

44. When Mr. Rao asked Captain Ruiz if he could double up on an ATV with another warden, Ruiz' response was to say, "No. You're going to walk."

45. Rao later learned from game wardens at the Galveston Law Enforcement Office that Captain Ruiz had been bragging about his retaliation against Rao by telling the game wardens in that office how he made Rao walk the dove fields.

46. On November 30, 2012, Rao took the TPWD Game Warden Physical Readiness Coordinator ("PRT") test.

47. After Rao successfully completed the sit up portion of the test, Captain Ruiz claimed that Rao needed to retake the sit up portion of the exam.

48. Captain Ruiz demanded that the trained coordinators who administered the test, and who had approved Rao's sit up test, needed to change Rao's score.

49. On January 17, 2013, Rao met with Major Skeen and Captain Ruiz.

50. During this meeting, Mr. Rao was called a "cancer" in the Department and a "troublemaker."

51. Rao was repeatedly threatened with losing his job and was informed that his next evaluation would not be a good one.

52. During this meeting, Mr. Rao was also told if he does not like his job, he should leave and go find a job with the Houston Zoo or HPD.

53. During this meeting, Rao was also told that his ticket numbers do not reflect the amount of hours he worked.

54. That allegation was false.

55. In March 2013, Rao filed a lawsuit under Title VII against TPWD for unlawful retaliation in the Southern District of Texas, Civil Action No. 4:13-cv-00729 *John Rao v. Texas Parks and Wildlife Department;* in The United States District Court for the Southern District of Texas, Houston Division.

56. In Rao's suit, Newman was named as a material witness to the allegations raised against TPWD.

57. Following the filing of Rao's suit, TPWD began retaliating against Newman.

58. For example, on July 6, 2013, approximately 2-3 months after TPWD was served with Warden Rao's lawsuit in which Newman was named as a witness, an incident occurred with respect to which Newman and Rao were falsely accused of improper conduct and dereliction of duties regarding an alleged boating while intoxicated incident.

59. On July 6, 2013, Newman was partnered with Warden Rao while they were taking part in a Water Saturation Patrol event on Clear Lake.

60. Warden Rao was driving the boat, and Newman was riding with him.

61. While leaving the dock, Newman noticed that a vessel, which was docked with a number of people loading and unloading different items on the boat, did not have a current registration.

62. Newman instructed Warden Rao to turn their vessel around so Newman could run the registration and issue a citation if necessary.

63. Warden Newman and Warden approached the vessel, and as they approached, Newman asked who was in charge of the boat since it was docked and nobody was behind the controls at that time.

64. An individual, whose initials are M.S., claimed that he was the party responsible for the boat.

65. Because it was a windy day, creating choppy water conditions, Warden Rao could not simply pull up next to the other boat because there was a possibility that due to the conditions he could damage either the state vehicle he was operating or the other boat.

66. Therefore, Warden Rao pulled up to the landing next to the boat ramp. Newman then indicated to M.S. that he should walk down the pier toward the ramp where it was less choppy so that they could better have a conversation.

67. Both Newman and Rao observed M.S. as he walked the length of the pier.

68. M.S. had no trouble walking the length of the pier, and he did not appear to be impaired during his walk.

69. M.S. then boarded the front of Newman's vessel.

70. Newman personally observed that M.S. had no issues stepping onto their vessel.

71. Newman then spoke to M.S.

72. M.S. did not smell of alcohol and did not slur his speech.

73. Newman then issued a citation for M.S. for the expired registration, since M.S. had indicated that he was responsible for the boat.

74. Newman had no reason to believe that M.S. was impaired at the time Newman conducted the inspection and spoke with M.S.

75. Therefore, Newman did not request a field sobriety test or a blood alcohol test of M.S.

76. On September 24, 2013, Newman was deposed in Rao's suit.

77. Notably, both Newman's immediate supervisor, Captain Ruiz, as well as the Regional Supervisor, Major William Skeen, attended Newman's deposition.

78. During that deposition, which was scheduled by Assistant Attorney General James Todd on behalf of the TPWD, Newman testified to his direct knowledge of the conversation between Rao and the Assistant Chief regarding why Warden Rao did not receive the promotion to Lieutenant.

79. Newman also testified to retaliatory actions he had witnessed that were taken against Rao since the time that Rao had assisted Newman back in 2007.

80. One month after Newman testified, in October 2013, Captain Ruiz issued Newman a write up regarding his citation to M.S.

81. In the write-up, Captain Ruiz claimed that at the time Newman issued the citation to M.S. for the expired registration, M.S. was intoxicated.

82. Captain Ruiz also claimed that Newman was at fault and failed to properly perform his duties for his failure to identify and respond appropriately to M.S. operating a boat while intoxicated at the time Newman issued M.S. the citation.

83. Captain Ruiz' claim was based on the fact that approximately 30 minutes after M.S. was cited by Newman, M.S. was pulled over by other Game Wardens and was arrested for Boating While Intoxicated.

84. The write up issued to Newman by Captain Ruiz contained numerous falsehoods about the alleged boating while intoxicated incident involving M.S. in an attempt to wrongfully attack Newman's performance.

85. Contrary to Captain Ruiz' assertion in the write up, no one was operating the vessel when Newman and Rao approached M.S.' vessel.

86. Rather, M.S.' boat was docked at the time Newman and Rao approached M.S.' vessel.

87. Additionally, the write up states that M.S. was pulled over by the second set of Game Wardens ten minutes after the initial stop.

88. That statement was also false.

89. Rather, the time difference between stops was anywhere from 23 minutes to one hour based on the various reports and citations created.

90. Heat, wave action and wind all affect blood alcohol levels, just as an individual's height, weight, whether the individual had an empty or full stomach, and how rapidly the individual consumed the alcohol are all factors that will vary the blood alcohol level of a person drinking alcohol.

91. Captain Ruiz also stated in the write up that M.S. must have been over a .080 blood alcohol level when Newman issued the citation to him.

92. That statement is also false.

93. Newman contested the validity of the write up given to him by Captain Ruiz since Newman had done nothing wrong with respect to the M.S. citation.

94. Captain Ruiz can articulate nothing improper that Newman did regarding Newman's interaction with M.S.

95. Newman filed a formal complaint and asked that his write up be investigated by TPWD.

96. No one at TPWD investigated Newman's complaint about the October 2013 write up.

97. On November 6, 2013, Newman received his annual performance evaluation.

98. At the time Newman received his evaluation, Newman learned that Captain issued Newman a "Needs Improvement" score on his 2013 Performance Appraisal for his alleged misconduct regarding the incident with M.S.

99. At that time, Newman was informed that because of the "needs improvement" score he received, Newman was no longer eligible to transfer out of his district, he was not eligible to apply for promotions, and he was not eligible to work a second job, which is routinely granted to TPWD game wardens.

100. Newman's inability to work a second job meant that Newman was unable to support his family in the same manner as his fellow game wardens, many of whom work second jobs.

101. On May 13, 2014, Rao's lawsuit against TPWD was assigned to trial to begin on June 30, 2014.

102. Newman was named as a witness for Warden Rao on his witness list submitted with Rao's pretrial materials.

103. Prior to trial, TPWD claimed to investigate Newman's actions to determine if Newman was working with Warden Rao on either March 22 or March 23, 2010, in order to determine if Newman could have in fact heard Captain Goodrich's statement, as Newman had previously testified to the EEOC and in his deposition.

104. The documents produced by TPWD in Warden Rao's suit, which included telephone records, toll road records and Newman's LEAP records (which is the name of the TPWD records kept of his daily activities on each workday), showed that Newman was in fact working with Warden Rao on March 23 at the time of the call between Warden Rao and Captain Goodrich.

105. Despite the fact that the records confirmed that Newman was in fact with Warden Rao at the time of the call as Newman had testified in Rao's suit, on June 13, 2014, TPWD nevertheless accused Newman of committing perjury in his testimony that supported Warden Rao's claim.

106. TPWD claimed that the phone records, toll records and Newman's LEAP records, combined with Newman's testimony, demonstrate that Newman must have been lying about the incident.

107. On June 13, 2014, TPWD also asserted that "it would be a mistake to regard this series of deceptions by Rao and Newman as relevant only to the June 30th trial."

108. TPWD threatened Newman with an internal affairs investigation and perjury charges if he proceeded to testify on behalf of Warden Rao at his trial.

109. On June 13, 2014, TPWD claimed that "[t]here can be little doubt that the IA investigation of Rao and Newman will result in their termination."

110. Thus, TPWD clearly threatened Newman with termination if he proceeded to testify at Rao's trial.

111. Newman proceeded to testify on behalf of Warden Rao at Rao's trial in federal court against TPWD.

112. Following Newman's testimony at Rao's trial, TPWD continued to retaliate against Newman.

113. Shortly after Newman testified for Warden Rao, Newman was given a written counseling regarding his LEAP records.

114. Newman was also instructed to radio dispatch each and every time that Newman was getting on and off the water for boat patrol.

115. Newman was also told to personally send a text message to Captain Ruiz each time he got on or off the water.

116. No other game warden was ever required to follow the procedures required of Newman by Captain Ruiz.

117. Captain Ruiz also singled Newman out from other Game Wardens in other areas, as well.

118. For example, similar to how Captain Ruiz treated Warden Rao, during patrols for the beginning of dove hunting season, which took place on September 1, 2014, each of the Game Wardens, except for Newman, were assigned the use of all-terrain vehicles to patrol.

119. However, with respect to Newman, Captain Ruiz required him to patrol on foot without the use of an all-terrain vehicle.

120. On September 2, 2014, Newman was given his annual performance evaluation.

121. In the evaluation, Newman was given an overall rating of unsatisfactory.

122. At the time Newman was given his unsatisfactory annual performance evaluation, he was also given a notice of intent to terminate his employment.

123. At that time, Newman was wrongfully accused of lying, insubordination and engaging in unethical conduct.

124. In the evaluation, TPWD claimed that Newman failed to detect an intoxicated boater.

125. TPWD also claimed that Newman intentionally falsified his boating hour records and failed to meet the requisite number of boating patrol and commercial oyster enforcement hours for 2013 and 2014.

126. Regarding the boating hours, Captain Ruiz falsely claimed that Newman had failed to meet his required boat hours for two years in a row.

127. When Newman was given his annual evaluation in September 2014, that was the first time that Captain Ruiz had ever claimed that Newman failed to meet his required annual boat hours for 2013.

128. Regarding the incident with the alleged intoxicated boater, TPWD can identify nothing improper that Newman had done regarding the incident with M.S.

129. Regarding the boat hours, contrary to Captain Ruiz' claim, Newman had in fact exceeded the requisite 300 boat patrol hours required for 2013.

130. Regarding the boat hours for 2014, during the 2014 year, Captain Ruiz had reassigned Newman's boat to Beaumont, Texas so that Newman would no longer have access to that boat in order to log boat patrol hours.

131. After Captain Ruiz reassigned Newman's boat to Beaumont, Texas, he assigned Newman a bass boat.

132. The use of a bass boat to conduct patrols or board commercial vessels on Galveston Bay would be unsafe.

133. Newman's lack of access to an appropriate vessel for boat patrol resulted in Newman having to work on boats assigned to other Game Wardens in order for Newman to meet the boat patrol hours requirement.

134. Regarding the boat hours for 2014, Captain Ruiz claimed that Newman was short by approximately 80 hours for the year.

135. In fact, Newman had logged more boating hours than Captain Ruiz had claimed on Newman's annual evaluation.

136. In addition, Captain Ruiz was aware that Newman was on sick leave from April 2014 through June 2, 2014.

137. During the time that Newman was on sick leave, Newman could have logged enough hours to meet the required annual number of hours.

138. At the time Newman was given his annual evaluation, Newman was suspended from his employment.

16

139. Newman was given until September 5, 2014 to submit a rebuttal to the performance evaluation Newman had been given on September 2, 2014.

140. In response to his performance evaluation, Newman provided a detailed rebuttal to the false allegations raised against him.

141. On September 17, 2014, despite an impeccable 30-year career as a TPWD Game Warden, TPWD followed through on its threat, and terminated Newman from his position at TPWD.

142. The reasons given to Newman for the termination of his employment is false.

143. When it discharged Newman, TPWD gave Newman a "general discharge" designation.

144. After Newman appealed, following a hearing before the State Office of Administrative Hearing, TPWD was ordered by the Administrative Law Judge to change the F-5 Report for Newman to indicate that Newman received an honorable discharge.

## VI.
## CAUSE OF ACTION—RETALIATION

145. Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

146. Under Title VII and the Texas Labor Code, it is unlawful for an employer to discriminate against any employee because that employee has opposed any practice made unlawful under Title VII or the Texas Labor Code, and because

that employee has testified, assisted, or participated in any manner in an investigation, proceeding or hearing under Title VII or the Texas Labor Code.

147. As described above, as a result of Newman's opposition to unlawful employment practices under Title VII, as well as Newman's participation and testimony on behalf of John Rao in Rao's suit against TPWD under Title VII, Newman was retaliated against and terminated from his position by TPWD, in violation of Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e *et seq.*, and the Texas Labor Code.

148. As a result of Defendant's unlawful retaliation, Plaintiff has incurred damages.

## VII.
## ATTORNEY'S FEES

149. Each and every allegation contained in the foregoing paragraphs are re-alleged as if fully rewritten herein.

150. Plaintiff is entitled to recover attorney's fees and costs for bringing this action pursuant to 42 U.S.C. § 1988.

## VIII.
## JURY DEMAND

151. Plaintiff requests a trial by jury on all issues triable by a jury in this case.

## IX.
## RELIEF REQUESTED

Plaintiff requests the following relief:

a. For actual damages for the period of time provided by law including appropriate backpay and reimbursement for lost pension, insurance, and all other benefits;

b. For reinstatement, or front pay in lieu of reinstatement;

c. For compensatory damages as allowed by law;

d. For pre-judgment and post-judgment interest as allowed by law;

e. For attorney's fees, expert witness fees and costs of court; and

f. For such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

CLINE | AHMAD

By: /s/ Nasim Ahmad
Nasim Ahmad
State Bar No. 24014186
723 Main St., Suite 904
Houston, Texas  77002
Telephone:  (832) 767-3207
Telecopier:  (281) 864-4379

ATTORNEYS FOR PLAINTIFF
KELLY NEWMAN