United States District Court
Southern District of Texas
**ENTERED**
June 06, 2018
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| KELLY NEWMAN, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:16-CV-2626 |
| | § | |
| TEXAS PARKS AND WILDLIFE | § | |
| DEPARTMENT, | § | |
|     Defendant. | § | |

**MEMORANDUM AND ORDER**

Currently pending before the Court in this employment discrimination case

is Defendant Texas Parks and Wildlife Department's ("TPWD") Motion for

Summary Judgment (the "Motion") [Doc. # 41].   Defendant argues that Plaintiff

Kelly Newman's claim that he was fired from his job in retaliation for assisting a

co-worker with that individual's own claims against TPWD fails as a matter of

law.   Plaintiff responded to the Motion, albeit not timely,[1] and Defendant timely

replied.[2]

---

[1]     The process by which Plaintiff responded to the Motion is somewhat convoluted.
Plaintiff's response was originally due on March 19, 2018.  Plaintiff ultimately
filed his untimely response to the Motion at 11:53 p.m. on March 30, 2018.
Plaintiff's Response to Defendant's Motion for Summary Judgment (the
"Response") [Doc. # 48]; *see also* Supplemental Unopposed Motion for Extension
of Submission Date for Defendant's Motions for Summary Judgment and
Summary Response to Motion for Summary Judgment (the "Partial Response")
(continued…)

The Motion is now ripe for decision. Having considered the parties' briefing, the applicable legal authorities, and all appropriate matters of record, the Court concludes that Defendant's Motion should be **granted in part and denied in part**.

## I.    BACKGROUND

Unless otherwise indicated, the following facts are not in genuine dispute for purposes of Defendant's Motion.

---

(continued…)

[Doc. # 46].  Plaintiff's counsel failed to meet the original deadline to respond to the summary judgment motion and made three motions to extend the response deadline despite repeated admonitions from this Court that such motions would not be considered.  *See* Order, dated February 13, 2018 [Doc. # 40], at ECF 1 ("Absent a true emergency or other extraordinary circumstance, the Court will not entertain additional requests to extend any of the deadlines in this case, including those contained in the Court's local procedures."); Order, dated March 20, 2018 [Doc. # 43], at ECF 1 ("The Court will not grant any additional request to extend deadlines, whether the request is opposed or unopposed.").  Nevertheless, in the interests of justice, the Court will consider the arguments and admissible evidence counsel presents on behalf of his client.

The Court notes, however, that none of Plaintiff's numerous requests for extensions were based on a true emergency or other extraordinary circumstances. Plaintiff repeatedly and unacceptably has disregarded the Court's explicit Orders and deadlines.  Plaintiff's counsel **is admonished** that no further extensions of deadlines will be permitted unless agreed by Defendant in writing in advance of the deadline.  Failure by Plaintiff's counsel to comply with applicable deadlines will result in the striking of late filings or denial of relief requested.

2    Defendant filed timely replies to the Partial Response and the Response, respectively.  *See* Defendant's Reply in Support of its Motion for Summary Judgment (the "Original Reply") [Doc. # 51]; Defendant's Supplemental Reply in Support of its Motion for Summary Judgment (the "Supplemental Reply") [Doc. # 52].

Plaintiff began working for Defendant as a game warden in 1985.  As a game warden, Plaintiff was a commissioned peace officer for the State of Texas. Plaintiff spent the majority of his career working in Harris County, Texas. Because Harris County, Texas includes several lakes and portions of Galveston Bay, game wardens working in that county often are tasked with boating safety enforcement and on-water enforcement of commercial and recreational fishing regulations.

The facts of this case overlap in part with the facts of a previous lawsuit filed against Defendant by Plaintiff Newman's former co-worker, game warden John Rao.  According to Plaintiff, in March 2010 he was riding in a car with Rao. During the car ride, Rao received a phone call informing him that he would not be receiving the promotion that he had applied for.  Plaintiff and Rao contend that during this call, Rao was told he did not receive the promotion because of a 2007 Charge of Discrimination that he had filed with the Equal Employment Opportunity Commission ("EEOC") alleging retaliation by Defendant.  Defendant vigorously denies Rao's and Plaintiff's account of what was said during the March 2010 phone call.

In any event, the March 2010 phone call prompted Rao to file another Charge of Discrimination against Defendant with the EEOC alleging that, under Title VII of the Civil Rights Act of 1964 ("Title VII"), he unlawfully was denied

3

the promotion he sought.  On September 29, 2011, Plaintiff Newman submitted a sworn statement to the EEOC on Rao's behalf in support of his 2010 Charge of Discrimination.

In October 2011, Captain Fred Ruiz became Plaintiff's immediate supervisor.  Defendant asserts that, in the two years prior to Plaintiff being fired, Ruiz frequently and accurately documented Plaintiff's poor job performance and insubordination.  The first such instance reflected in the summary judgment record is an August 6, 2012, written "counseling" Ruiz issued to Plaintiff.  Ruiz counseled Plaintiff regarding his failure to comply with his district's "summer initiative." Specifically, Ruiz noted that Plaintiff did not participate in boat patrols during "several weekends" despite the initiative's requirement that each game warden in the district be on the water for at least 10 hours per weekend.[3]  As part of this same counseling, Plaintiff also was advised that his facial hair was not in compliance with Defendant's appearance standards.[4]  Plaintiff cites no competent evidence that Ruiz was aware that he had engaged in any protected activity, *i.e.,* provided support to Rao's EEOC charge, in August 2012.

---

[3]     Plaintiff's Employment Records [Doc. # 41-1], at ECF 8-10.

[4]     *Id*. at ECF 8.

Ruiz counseled Plaintiff again on February 20, 2013, for his conduct relating to boat patrols.  Ruiz reported that, on December 17, 2012, he directed all game wardens in Plaintiff's district to enforce commercial oyster rules by spending 4 to 6 hours a week patrolling Galveston Bay by boat.  Two days thereafter, on December 19, Plaintiff reported that he had spent 9 hours patrolling Galveston Bay by boat.  However, it was later determined that Plaintiff's December 19 patrol activities were limited to inspections of docks by land, and that he had not spent any time patrolling by boat on that date (the "December Time Log Incident").[5]  According to Defendant, Ruiz specifically asked Plaintiff whether he had patrolled by boat that day, and Plaintiff affirmatively represented to Ruiz that he had.[6]  The February 20, 2013, counseling memorandum from Ruiz to Plaintiff also states that "Major William Skeen, Captain Nick Harmon and I have previously instructed you about

---

[5]     *Id*. at ECF 11-19.

[6]     Plaintiff does not deny that he told Ruiz he had patrolled by boat on December 19, 2012.  However, he does contend that Defendant's claim that he "lied" about his actions on that day is unreasonable in light of the explanation he provided to Ruiz for the discrepancy.  *See* Declaration of Kelly Newman ("Plaintiff Declaration") [Doc. # 48-4], ¶ 23 ("I clearly explained to Ruiz that I had partnered up with another game warden that day to log boat hours, and my log reflected that. However, the weather became inclement such that we were required to patrol the dock by vehicle that day, but I inadvertently failed to update my [time sheets] to reflect that.").  There is no dispute that Plaintiff did not spend any time patrolling by boat on December 19, 2012.

proper and accurate reporting of patrol hours on the water versus patrol hours on land."[7]

Approximately two weeks after the February 2013 counseling, on March 3, 2013, Ruiz received a memorandum from game warden Cullen Stakes regarding statements Plaintiff had made to him while both were attending the Houston Rodeo.  According to Stakes, Plaintiff accused Ruiz of lying to the game wardens in the district regarding the timing of another employee's departure from Defendant's employ.[8]  In a separate incident, which Plaintiff does not deny, Plaintiff called Ruiz "Devil Fred" in a conversation with game warden Ray Canales.[9]

On March 14, 2013, Rao filed suit against Defendant in the Southern District of Texas asserting a claim for retaliation under Title VII (together with Rao's 2010 EEOC Charge of Discrimination, the "Rao Litigation").  The Rao Litigation was premised on the same allegations as his 2010 Charge of Discrimination.  Newman was identified as a material witness in the complaint in the Rao Litigation.

---

[7]    Plaintiff's Employment Records [Doc. # 41-1], at ECF 11.

[8]    *Id*. at ECF 20.  Plaintiff also conveyed to Stakes that after speaking with the employee in question about Ruiz's comments, the departing employee told Plaintiff that he was "gonna shove his foot so far[] up [Ruiz]'s ass he would have to wear it as a hat."  *Id*.

[9]    Deposition of Kelly Newman [Doc. # 41-1], 150:07-150:23 at ECF 86.

On May 8, 2013, Plaintiff met with Defendant's Executive Director Carter Smith in Austin, Texas.  According to Plaintiff, the meeting with Smith resulted in a phone conversation with Colonel Craig Hunter, who subsequently informed Plaintiff that he had met with Ruiz and Skeen regarding Plaintiff's "complaints of retaliation."[10]  The record contains no evidence regarding what occurred during the purported meeting among Hunter, Ruiz and Skeen.

In May 2013, Ruiz documented issues with Plaintiff's boat patrol performance.  During the weekend of May 18-19, 2013, Rao and Plaintiff were partnered to patrol Clear Lake by boat.  According to Ruiz, despite constituting 20% of the game wardens patrolling Clear Lake by boat that weekend, Plaintiff and Rao wrote only 3 out of 48, or 6.25%, of the citations that were issued during that period, and made 17 out of 142, or 12%, of the game warden radio transmissions.  Ruiz stated further that Rao and Plaintiff were "hiding out" rather

---

[10]   Deposition of William Skeen ("Skeen Deposition") [Doc. # 48-2], 93:10-95:17.  In his declaration, Plaintiff makes the conclusory averment that "I was retaliated against for my participation in [the Rao Litigation] since my supervisors became aware that I acted as a witness for Warden Rao during the EEOC's investigation of his Charge and the subsequent lawsuit."  Plaintiff Declaration [Doc. # 48-4], ¶ 6.  Plaintiff also avers that "I have personal knowledge that both my direct supervisor and our Regional Supervisor are aware that I assisted Warden Rao with his 2010 Charge of Discrimination and subsequent lawsuit."  *Id.*, ¶ 7. Plaintiff offers no explanation when or how he obtained such personal knowledge.  Nor does Plaintiff disclose when Ruiz and Skeen became aware of his participation in any protected activity.  Construing the record in the light most favorable to Plaintiff, the Court concludes Ruiz and Skeen learned of Plaintiff's assistance to Rao no earlier than the alleged May 2013 meeting among Hunter, Ruiz and Skeen.

7

than positioning themselves in an area where they could be most effective and made no efforts to assist their fellow wardens handle a boating while intoxicated ("BWI") arrest.

On July 6, 2013, Plaintiff was involved in another incident involving his boat patrol responsibilities (the "July 2013 Boat Incident").  While again patrolling with Rao, Plaintiff issued a boater a citation for having an expired registration. Plaintiff did not administer any field sobriety tests on the boater.  Within an hour of being cited by Plaintiff (and potentially as few as twenty-three minutes thereafter), that same boater was pulled over by other game wardens that were patrolling by boat and was arrested on suspicion of BWI.  The boater then submitted to a blood test.  A toxicology report dated July 19, 2013, concluded that the boater's blood alcohol level exceeded the applicable limit.[11]  Although later on July 6, Ruiz asked Plaintiff to give him the copy of the citation that Plaintiff had issued to the boater, Ruiz did not counsel or otherwise admonish Plaintiff or Rao with respect to what had occurred.

Plaintiff strongly denies that he or Rao did anything wrong in connection with the July 2013 Boat Incident.  According to Plaintiff, he issued the citation to

---

[11]     *See* Texas Department of Public Safety Alcohol Content Laboratory Report, dated July 19, 2013 [Doc. # 48-14] (showing blood alcohol level of 0.08 grams of alcohol per 100 milliliters of blood).

the boater in question while the boat was docked and not in use.  Moreover, because individuals were both loading items onto the boat and unloading items off of the boat, it was not readily apparent to Plaintiff or Rao that anyone would be operating the boat in the immediate future.   Plaintiff avers further that he and Rao observed the boater walking on the dock and step onto their boat without issue or indication of impairment.  Plaintiff adds that the boater did not smell of alcohol or slur his speech when speaking with Plaintiff.  In short, Plaintiff contends that at the time he issued the boater a citation, there was no reason for him to suspect that the boater had been drinking or was intoxicated.

On September 21, 2013, Ruiz prepared Plaintiff's performance evaluation for the period September 1, 2012 to August 31, 2013 ("FY 2013").  For four of the seven "core competencies" assessed in the evaluation, service focus, effective communication, continuous learning/adaptable to change, and commitment to safety, Plaintiff received a score of 3 out of 5, or "meets expectations."  For the remaining three "core competencies," mission focus, integrity/accountability, and teamwork, Plaintiff received a score of 2 out of 5, or "needs improvement."  Ruiz stated that Plaintiff's below-expectation ratings for those three competencies were due to the July 2013 Boat Incident, the December Time Log Incident, and his comments to Stakes and reference to Ruiz as "Devil Fred," respectively.  For FY 2013, Plaintiff was given an overall assessment of "needs improvement."   In

connection with his "needs improvement" rating, Plaintiff was given a performance improvement plan (the "Improvement Plan"). Among other mandates, the Improvement Plan required Plaintiff to attend additional BWI trainings as necessary, forbade him from making false allegations about his co-workers or supervisors, and ordered him, going forward, to inform dispatch every time he got on or off the water when patrolling by boat. Although prepared in September 2013, Plaintiff's FY 2013 performance review was not presented to him until November 7, 2013.[12]

On September 25, 2013, Newman was deposed in the Rao Litigation. Skeen attended the deposition. During his deposition, Plaintiff was asked about the July 2013 Boat Incident. According to Plaintiff, his September 2013 deposition in the Rao Litigation was the first time Defendant had indicated that it believed he acted improperly on July 6, 2013 by failing to identify an intoxicated boater. On October 7, 2013, approximately three months after the fact, Ruiz for the first time counseled Plaintiff regarding the July 2013 Boat Incident. Plaintiff argues that Defendant's unreasonable delay in addressing the July 2013 Boat Incident with

---

[12]     According to Ruiz, the delay in presenting the review to Plaintiff was due, at least in part, to the fact that Ruiz was out on medical leave. Ruiz Declaration [Doc. # 41-1], at ECF 4. A Lieutenant Longoria, not Ruiz, actually presented the review to Plaintiff. *Id.*

him demonstrates that the incident was a "set up" that Defendant hoped to use to obfuscate its true reason for eventually firing Plaintiff: retaliation.

On October 18, 2013, Ruiz briefed all of the game wardens in Plaintiff's district about the district's upcoming oyster initiative (the "FY 2014 Oyster Initiative").  Pursuant to the terms of the initiative, which was scheduled to be in effect from November 2013 to April 2014, game wardens would be required to work in teams and work 4 to 6 hours a week patrolling by boat for commercial oyster enforcement.

In January 2014, Ruiz verbally counseled Plaintiff that he was not in compliance with the FY 2014 Oyster Initiative's boat patrol requirements.  Ruiz also informed Plaintiff that he had not been radioing dispatch when he got on and off the water when patrolling by boat as required by his Improvement Plan.  On February 12, 2014, Ruiz followed up on his January 2014 verbal counseling with a written counseling memo.  According to Ruiz, a written memo was needed because Plaintiff "failed to achieve any of the goals or directives" he had set for Plaintiff during the January 2014 verbal counseling.  The memorandum stated that, between November 2013 and the end of January 2014, Plaintiff only had 12 boat patrol hours for the FY 2014 Oyster Initiative, well below the number of hours he should have if he were compliant with the initiative's requirement of completing 4 to 6 hours a week of boat patrol.  Ruiz also identified in the memorandum six dates

11

between November 2013 and January 2014 on which Plaintiff failed to inform dispatch that he was getting on the water, getting off the water, or both.

On March 31, 2014, Plaintiff submitted a sworn declaration on Rao's behalf in the Rao Litigation.   The declaration was made in response to Defendant's motion for summary judgment in that case.   Defendant's motion for summary judgment in the Rao Litigation was granted in part and denied in part.   Trial in the Rao Litigation was set for late-June 2014.

On June 3, 2014, Ruiz prepared another written counseling memorandum to Plaintiff regarding his failure to comply with the terms of his Improvement Plan.[13] Ruiz states in the memorandum that on two occasions in March 2013 Plaintiff failed to notify dispatch when he was getting on or off of the water when patrolling by boat.   The memorandum also states that the number of boat patrol hours claimed by Plaintiff for March 19, 2014, was inconsistent with his radio activity for that day.

On July 1, 2014, Plaintiff testified as a witness for Rao at the trial in the Rao Litigation.   Two days later, the jury in the Rao Litigation returned a verdict in favor of Defendant.   A final judgment in the Rao Litigation was entered on July 14, 2014.

---

[13]     It appears that the memorandum was shared with or read by Plaintiff on June 9, 2014.

Also on July 14, 2014, Ruiz authored a third counseling memorandum to Plaintiff with respect to Plaintiff's compliance with his Improvement Plan.[14] According to the memorandum, Plaintiff failed to notify dispatch that he was getting on or off of the water for boat patrols on two separate occasions in June 2014. In addition, Ruiz advised Plaintiff that he had only logged 91 of the 300 required boat patrol hours for the current fiscal year, which was set to end on August 31, 2014. Plaintiff was ordered to begin patrolling by boat for at least five hours a day, four days a week, until Ruiz instructed him that he no longer needed to do so. Plaintiff also was ordered to text, email, or call Ruiz each time he got on or off the water going forward.

On August 7, 2014, Ruiz emailed Skeen regarding Plaintiff's performance. Ruiz stated in his email that Plaintiff had continued to fail to abide by the terms of his Improvement Plan, and that since his July 23, 2014 counseling, Plaintiff had not called, emailed, or texted Ruiz even once when Plaintiff got on or off of the water. Ruiz also notified Skeen that Plaintiff had shown up to a district meeting three days earlier wearing casual clothing, in violation of Defendant's uniform policy. After that meeting, Plaintiff was scheduled to go to Defendant's game warden training center to re-take a physical exam he had failed on his first attempt.

---

[14]  It appears that the memorandum was shared with or read by Plaintiff on July 23, 2014.

According to Ruiz, he verbally counseled Plaintiff about the appropriateness of his attire that same day.  Ruiz also prepared a written counseling regarding Plaintiff's failure to abide by Defendant's dress code.

In-mid to late August 2014, Ruiz documented two additional instances of allegedly improper conduct by Plaintiff.  First, Plaintiff told other game wardens during border operations that Ruiz had lied and falsified documents.  Second, Plaintiff told other game that he would not patrol by foot during the upcoming opening day for dove hunting season despite being assigned to do so.  On September 1, 2014, the opening day for dove hunting season, Ruiz documented Plaintiff as reporting to work over an hour late.

The following day, on September 2, 2014, Ruiz presented Plaintiff with his employee performance evaluation for the period September 1, 2013 to August 31, 2014 ("FY 2014").  For the first category, mission focus, Plaintiff received a rating of 1 out of 5, or "unsatisfactory."  Ruiz explained that this rating was driven by Plaintiff's failure to log the requisite 300 hours of boat patrol activity, as well as his failure to participate adequately in the FY 2014 Oyster Initiative.  For the second category, integrity/accountability, Plaintiff also received a rating of "unsatisfactory."  According to the evaluation, Plaintiff achieved this rating because he did not adhere to his Improvement Plan.  For the category of

communication, Plaintiff also was rated "needs improvement."[15]  Plaintiff's rating in this category was attributable to his failure to utilize the chain of command structure when addressing issues or directives[16] and the inappropriate comments he made to other game wardens during border operations accusing Ruiz of lying and falsifying documents.

Also on September 2, 2014, Plaintiff was given a memorandum from Ruiz entitled "Consideration for Formal Corrective Action – Letter of Intent" (the "LOI").   Ruiz stated in the LOI that formal disciplinary action was being considered against Plaintiff because of Plaintiff's "continued failure to achieve and sustain satisfactory performance and a further decline in [his] performance since [his] last annual evaluation."   Ruiz identified six reasons Plaintiff was receiving the LOI: (i) his failure in both FY 2013 and FY 2014 to meet the required 300 hours of boat patrol;[17] (ii) his failure to comply with the FY 2014 Oyster Initiative;[18] (iii) his

---

[15]   Plaintiff received a rating of "meets expectations" in the categories of service focus, teamwork, continuous learning/adaptable to change, and commitment to safety.  Plaintiff's FY 2014 Performance Review [Doc. # 41-1], at ECF 71-75.

[16]   According to Ruiz, Plaintiff directly emailed Defendant's Director of Human Resources regarding an issue with a report pertaining to an alleged injury instead of him.   Ruiz also wrote that Plaintiff "has sent emails outside his chain of command on district related issues that are not in the scope" of the Defendant's human resources policy that allows a game warden to go outside his chain of command.  *Id.* at ECF 73.

[17]   Specifically, Ruiz stated that Plaintiff had only logged 265 boat hours in FY 2013 and 218 hours in FY 2014.  LOI [Doc. # 51-1] at ECF 1.

disregard for the directives of his Improvement Plan and counselings related thereto; (iv) his failure to cease making disrespectful and disruptive comments to other game wardens;[19] (v) his failure to consistently notify dispatch, or call, email or text Ruiz, when he started and ended his boat patrols; and (vi) his failure to communicate to Ruiz any "legitimate reason" for not accomplishing any district, region, or division goal or the goals in his Improvement Plan.  The LOI does not make explicit reference to the July 2013 Boat Incident.  Plaintiff was given until September 5, 2014, to respond to the LOI.[20]

---

[18]  (continued…)
For example, Plaintiff had a total of 21 oyster patrol hours for FY 2014.  LOI [Doc. # 51-1], at ECF 1.  Pursuant to the 2014 Oyster Initiative, game wardens were mandated to spend at least 104 hours (4-6 hours *each week*) between November 2013 and April 2014 on the water engaging in commercial oyster enforcement.  2014 Oyster Initiative [Doc. # 41-1], at ECF 39.

[19]  *See* LOI [Doc. # 51-1], at ECF 1-2 ("You continue to make disrespectful and disruptive statements to fellow game wardens, including accusing me of 'falsifying documents' and 'lying' during August border operations and telling other wardens that you were not going to work the assignments given for Labor Day weekend.").

[20]  Although Plaintiff argues he was given an unreasonable amount of time to respond to the LOI, he cites no evidence that the time he was given to respond was a deviation from Defendant's stated policy on the subject.  *See* Skeen Deposition [Doc. # 48-2], 48:23-49:06 ("**Q**: Is that true that Mr. Ruiz provided Mr. Newman with a very limited amount of time to respond?  **A**: It would have been the standard.  Every employee has the same standard amount of time to respond, and I can't recall what the time is, but every employee has the same time.  **Q**:  Okay.  Set forth in some TPWD policy?  **A**: Yes.").

16

On September 5, 2014, Plaintiff provided a written response to the LOI to Defendants (neither side has submitted this September 5th in their briefing on the Motion.).  That same day, Defendant prepared an internal memorandum to address Plaintiff's response to the LOI.  The memorandum noted Plaintiff's tardiness on September 1, 2014, his failure to abide by Defendant's uniform policy on August 4, 2014, and the fact that he "continues to spread discontent by making disruptive and false statements" about Ruiz.  It also provided additional details about Plaintiff's failure to comply with the terms of his Improvement Plan.  For example, the memorandum noted that Plaintiff not only failed to meet his oyster patrol hours for FY 2014, but that he had not filed a commercial oyster case in at least three years despite the implementation of multiple oyster patrol initiatives.  The memorandum also states that Plaintiff failed to meet his required oyster patrol hours, and boat hours more generally, despite the fact that Ruiz had assigned Plaintiff his own boat in FY 2013.[21]  Finally, the memorandum noted that in his

---

[21]     *See* Defendant's Memorandum Regarding Plaintiff's Response to LOI [Doc. # 41-1], at ECF 31 ("I have assigned him his own state vessel (20ft Proline) in FY 13. However ironically he has not purchased boat fuel in over two years. May 9, 2012 was the last time Warden Newman has purchased boat fuel."); *see also* Deposition of Fred Ruiz Deposition ("Ruiz Deposition") [Doc. # 48-1], 69:05-69:21 ("**Q**: Was Warden Newman assigned a boat?  **A**:  So he was assigned a little bass boat, initially, when I got there.  I got rid of those boats.  They were -- I felt that they were unsafe, so we got rid of them.  In FY '13 he was assigned a Pro-Line.  I took that away from Mark Bain and gave it to Warden Newman.  **Q**:  Why?  **A**: Warden Newman had indicated a displeasure of my getting rid of his boat and not letting him know, and that certainly was my fault.  I was hot and heavy about
(continued…)

August 2014 time sheet, Plaintiff inappropriately logged boat hours for time he spent traveling via land from Houston, Texas, to McAllen, Texas, for border operations.

On September 16, 2014, Defendants circulated another internal memorandum regarding Plaintiff.   The memorandum constituted Defendant's recommendation as to Plaintiff's employment status based on the LOI and his response thereto (the "Termination Memorandum").    The Termination Memorandum states in relevant part that:

> Despite his experience and tenure, Warden Newman has failed to achieve and sustain satisfactory performance.   His progress and deficiencies were tracked and discussed with him on multiple occasions, and steps necessary for him to successfully rise above "Needs Improvement" were outlined to him in verbal and written counseling and a [Improvement] Plan.  Warden Newman's failure to respond or to follow directions or orders given to him has continued into the current fiscal year, when he showed up more than an hour late for an assigned detail on the opening day of dove season.  Due to his continued unsatisfactory performance and insubordinate conduct, I recommend that Warden Newman's employment with TPWD be terminated.[22]

---

(continued…)

getting rid of those boats, and I got rid of them as quick as I could.  I felt, again, that they were unsafe.  And so Warden Newman had indicated that he wanted a boat.  I had given him a 13-foor Pro-Line that we initially had.  I'm sorry.  Not a 13-foot. 20-foot Pro-Line.  And I had taken that from Mark Bain and signed it over to Warden Newman.").

[22]    Termination Memorandum [Doc. # 48-30], at ECF 2.   The Termination Memorandum does not make reference to the July 2013 Boat Incident.

On September 17, 2014, Colonel Hunter approved the termination recommendation and Plaintiff received notice of the termination later that day.

After filing his own Charge of Discrimination with the EEOC, Plaintiff initiated this lawsuit asserting a claim for unlawful retaliation under Title VII's anti-retaliation provision.

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349

(5th Cir. 2005).  The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992)).  If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-

20

movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts that show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations or weigh any evidence. *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412–413).  The Court is not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id.* (citing *Reaves Brokerage*, 336 F.3d at 413).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.  *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter–Reed v. City of*

*Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).  A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.  *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

Finally, although the Court may consider all materials in the record when deciding a summary judgment motion, "the court need consider only the cited materials." FED. R. CIV. P. 56(c)(3). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court.  Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (internal citations and quotation marks omitted).

## III.   <u>ANALYSIS</u>

### A.   **Analysis of Putative Direct Evidence of Defendant's Alleged Unlawful Retaliation**

Title VII forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a).  Title VII also contains an anti-retaliation provision that prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a

22

charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006).  "A plaintiff may prove a retaliation claim through direct or circumstantial evidence.  In most cases, the employer does not explicitly state a retaliatory purpose for discharging an employee. Without direct evidence, the plaintiff must establish his cause of action using circumstantial evidence and the *McDonnell Douglas* [*v. Green*, 411 U.S. 792 (1973)] burden-shifting framework." *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 275 (5th Cir. 2006); *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005).

Plaintiff argues that he has direct evidence of Defendant's retaliatory intent in terminating his employment and the Court therefore need not apply the *McDonnell Douglas* burden shifting framework to his claim.  In support of this argument, Plaintiff relies solely on a letter written by a Texas Assistant Attorney General, Defendant's counsel, that was part of a court-ordered mediation in the Rao Litigation (the "Letter") [Doc. # 49].[23]  The Letter constituted Defendant's required pre-conference settlement offer under the procedures of then-United States Magistrate Judge George C. Hanks Jr., the assigned mediator.  Plaintiff argues the Letter shows that Plaintiff was fired because he assisted Rao in Rao's

---

[23]     Notice of Settlement Conference [Doc. # 18-1].

pursuit of Title VII claims against Defendant.[24]  Defendant strenuously opposes Plaintiff's use of the Letter because it is inadmissible as evidence for summary judgment or trial purposes.  The Court agrees.

The Court previously addressed the admissibility of the Letter in this case during a June 14, 2017, discovery hearing that was dedicated exclusively to that issue.  A key issue relating to the Letter's admissibility is whether it falls within the scope of the "Confidentiality of Proceedings" provision in then-Magistrate Judge Hanks' "Notice of Settlement Conference" governing the mediation.  The "Confidentiality of Proceedings" provision states that all matters within its purview "shall remain confidential, shall not be used in the present litigation or in any other litigation (whether presently pending or filed in the future), and shall not be construed as nor constitute an admission."[25]  During the hearing, the Court received explicit confirmation from Judge Hanks that the Letter, as it states on its face, was submitted as part of a court-ordered mediation process and was within the scope of the "Confidentiality of Proceedings" provision in the Notice of

---

[24]     As discussed *infra*, the Letter essentially states that Defendant's counsel believed Rao and Plaintiff were lying about certain statements they made during the Rao Litigation, and that Defendant's counsel was contemplating taking certain actions against them as a result.

[25]     Notice of Settlement Conference [Doc. # 18-1], at ECF 2; *see also* S.D. Texas Loc. Rule 16.4.I.

Settlement Conference.[26]  Accordingly, the Court ruled that the Letter itself is not admissible evidence in this case.[27]

Although the Court foreclosed Plaintiff's use of the Letter itself as evidence, Plaintiff was permitted to use statements in the Letter in discovery to question witnesses about the Letter's contents.  Plaintiff also was permitted to inquire whether any of Defendant's employees had a hand in its creation and whether the events described therein played a role in Defendant's decision to terminate Plaintiff's employment.  If so, that independently obtained information would be admissible evidence in this case.[28]  Plaintiff has offered no such evidence in his responses to the Motion.  Specifically, Plaintiff cites no competent evidence demonstrating that any of Defendant's employees had a role in writing or creating the Letter, spoke to the Letter's author about it before it was sent, agreed with the Letter's contents, used the Letter as a basis to terminate Plaintiff's employment, or

---

[26]    Transcript of Discovery Hearing, held June 14, 2017 (hereinafter, the "Discovery Hearing Transcript) [Doc. # 26], 09:04-09:12.

[27]    *Id.* at 09:25-10:04, 10:15, 11:17-11:19, 11:25-12:01.  *See also* S.D. Texas Loc. Rule 16.4.I. ("All communications made during ADR proceedings (other than communications concerning scheduling, a final agreement, or ADR provider fees) are confidential, are protected from disclosure, and may not be disclosed to anyone, including the Court, by the provider or the parties.").

[28]    *Id*. at 11:03-11:13 (They can answer: Did you have anything to do with creating it? Were these your views? Did you have any -- did you disagree with these things? Did this letter impact your thinking? . . . I'll let you get that information from these witnesses, but the letter is not coming into evidence . . .").

believed the Letter could be used as a basis to terminate Plaintiff's employment.[29]

In short, Plaintiff has failed to discover any admissible direct evidence of retaliation by Defendant in this case.[30]

This conclusion is reinforced by the strong public policy supporting complete confidentiality of mediation proceedings, a doctrine embodied in this District's Local Rule 16.4.I, which provides:

> All communications made during ADR proceedings (other than communications concerning scheduling, a final agreement, or ADR provider fees) are confidential, are protected from disclosure, and may

---

[29]   Plaintiff did elicit deposition testimony from Ruiz that he had read the Letter upon receiving it.  Plaintiff, however, points to no specific evidence that Ruiz or any employee of Defendant based any employment decision on the belief that Plaintiff testified falsely in connection with the Rao Litigation, which was the focus of the Letter.

[30]   In his Response, Plaintiff asserts that the Letter's admission into evidence is not precluded by Rule 408 of the Federal Rules of Evidence.  Rule 408(a) prohibits the admission of "conduct or a statement made during compromise negotiations about the claim . . ."  FED. R. EVID. 408(a).  However, Rule 408(b) states that "[t]he court may admit this evidence for another purpose, such as proving a witness's bias or prejudice . . ."  FED. R. EVID. 408(b).  The Court exercises its discretion under Rule 408 to deny admission of the Letter.  Further, the Letter also would be inadmissible at trial under Rule 403 of the Federal Rules of Evidence. The Letter's probative value is far outweighed by the likelihood of confusion of the jury and waste of time.

Plaintiff also contends Defendant has waived any claim of confidentiality to the Letter.  Plaintiff's contention is unavailing.  Defendant's counsel's decision to share the Letter with his own client does not constitute a waiver of that document's confidentiality.  Plaintiff cites no authority to support this counter-intuitive proposition.  Second, it would be unreasonable and inequitable to allow Plaintiff to benefit from his own counsel's failure to respect mediation confidentiality principles by filing the Letter publicly.

> not be disclosed to anyone, including the Court, by the provider or the
> parties.   Communications made during ADR proceedings do not
> constitute a waiver of any existing privileges and immunities.[31]

The Court declines to narrow this critically important principle.  The fact that the

Letter may no longer be unknown outside of the mediation because Plaintiff's

counsel improperly filed it of record in the Rao Litigation does not change this

outcome.   Judge Hanks' order and the District Local Rule requiring absolute

confidentiality govern.

Finally, Plaintiff's argument that the Letter constitutes direct evidence of

retaliation by Defendant falls of its own weight on the merits.  The Letter does not

show what Plaintiff claims.   The gravamen of the Letter is that Defendant's

counsel believed, based on objective (but mistaken) evidence, then-recently

obtained, that Rao and Newman, both law enforcement officers, were untruthful

regarding their account of a March 2010 phone call between Rao and one of

Defendant's senior employees, a key piece of evidence in the Rao Litigation.

Defendant's counsel unwisely stated in the Letter that if Rao failed to drop his

lawsuit and cooperate in an internal affairs investigation of what counsel believed

---

[31]    *See also* Tex. Civ. Prac. & Rem. Code Ann. § 154.073(a) ("Except as provided by
[subsections inapplicable to the facts of this case], a communication relating to the
subject matter of any civil or criminal dispute made by a participant in an
alternative dispute resolution procedure, whether before or after the institution of
formal judicial proceedings, is confidential, is not subject to disclosure, and may
not be used as evidence against the participant in any judicial or administrative
proceeding.").

were Newman's verifiably false statements regarding the March 2010 phone call, Rao and Plaintiff would be subject to an internal affairs investigation, that Defendant would pursue claims that the Rao Litigation was initiated and pursued in bad faith, and that Defendant would present to the United States Attorney's Office the information complaining of possible perjury.  Eventually, counsel's statement was shown to have been based on an erroneous factual predicate, the date on which the alleged March 2010 phone call took place, and no investigation or other proceedings ever were instituted against Plaintiff or Rao.  The Letter was clearly an error on counsel's part, but it was not tied to any subsequent conduct by Defendant's employees.  Absent such a connection between the Letter and at least one individual employed by Defendant with a meaningful role in terminating Plaintiff's employment, the Letter is not probative direct evidence of Defendant's purported retaliatory intent to fire Plaintiff.

Plaintiff lacks any direct evidence of retaliation.  The Court accordingly turns to its analysis of Plaintiff's claim under the *McDonnell Douglas* framework.

### B.    Analysis Under *McDonnell Douglas* Burden-Shifting Framework

To establish a *prima facie* case of retaliation under *McDonnell Douglas*, a plaintiff must show that: (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action.  *Alkhawaldeh v. Dow Chem. Co.*, 851

28

F.3d 422, 427 (5th Cir. 2017). Such a showing by a plaintiff "gives rise to an inference of retaliation" and the "burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action. *Id.* (citation omitted). "Once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to demonstrate that the employer's [stated] reason is actually a pretext for retaliation." *Id.* (internal quotation marks omitted).

### 1.    Plaintiff's *Prima Facie* Retaliation Case

Regarding the first prong of the *McDonnell Douglas* analysis, Defendant does not dispute that Plaintiff participated in a protected activity by supporting Rao in his pursuit of Title VII claims against Defendant and that Plaintiff suffered an adverse employment action when he was fired in September 2014. Rather, Defendant challenges whether Plaintiff has presented evidence showing a causal connection between his assistance to Rao and his discharge. The Court is not persuaded by this challenge. Defendant employed Plaintiff for nearly thirty years. The Court draws all reasonable inferences in Plaintiff's favor as required for summary judgment purposes. The temporal proximity of two and one half months between Plaintiff's testimony in the Rao Litigation (July 1, 2014) and his discharge from Defendant's employ (September 17, 2014), plus Ruiz's admission in deposition that he was aware of Plaintiff's testimonial support of Rao's claim in

the Rao Litigation, satisfies the causation element of Plaintiff's *prima facie* case under the *McDonnell Douglas* framework.[32]

### 2. Defendant's Proffered Legitimate, Non-Retaliatory Reasons for Plaintiff's Discharge

The Court next considers whether Defendant has articulated a legitimate non-retaliatory reason for terminating Plaintiff's employment. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Defendant has satisfied its burden in this case.

Defendant informed Plaintiff in the LOI, by enumerating six factual bases for Plaintiff's alleged violation of several TPWD regulations, that it was considering formal corrective action against him. Defendant summarized the concerns as inadequate job performance, inadequate job knowledge, insubordination, and misconduct in the form of physical or verbal abuse towards another of Defendant's employees or customers.[33] These same reasons were listed

---

[32]    *See Richardson v. Prairie Opportunity, Inc.*, 470 F. App'x 282, 286 (5th Cir. 2012) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation.") (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007)).

[33]    Letter of Intent [Doc. # 51-1], at ECF 26-27.

in the Termination Memorandum,[34] which was Defendant's summary articulated basis for Plaintiff's discharge.[35]  It is unclear whether Defendant contends that each of these incidents or reasons warranted Plaintiff's termination or whether Defendant relies on several or the totality of the reported instances of Plaintiff's poor job performance and/or insubordination.  Regardless, Defendant has met its burden of production to articulate legitimate, non-retaliatory reasons for its actions. *See, e.g., LeMaire v. La. Dep't of Transp. & Dev.,* 480 F.3d 383, 391 (5th Cir. 2007) ("Job performance is a legitimate, non-retaliatory reason for termination."); *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt.*, 498 F. App'x 448, 451 (5th Cir. 2012) ("The record shows that the Defendants presented evidence of a legitimate, non-retaliatory reasons—namely, [the plaintiff's] insubordinate behavior and inappropriate communications—for each of the allegedly retaliatory acts.").

### 3.    Pretext Analysis

The burden therefore shifts back to Plaintiff to demonstrate that Defendant's stated reasons for terminating his employment are actually pretexts for retaliation. "To demonstrate pretext and avoid summary judgment, [a plaintiff] must show 'a

---

[34]    Formal Corrective Action Request [Doc. # 48-30], at ECF 2.

[35]    Notice of Termination [Doc. # 48-30], at ECF 1.  Ruiz and Skeen, Plaintiff's supervisors, testified that those, in fact, were the reasons that Plaintiff was discharged from his position.

conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015) (quoting *Coleman v. Jason Pharm.*, 540 F. App'x 302, 304 (5th Cir. 2013). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015).  In addition, "[a]n employee seeking to show pretext must rebut each discrete reason proffered by the employer." *Burton,* 798 F.3d at 233.

A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action.  *Id*.  "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination even without further evidence of defendant's true motive."  *Id*.; *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) ("[T]he plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.  Moreover, although

the presumption of discrimination drops out of the picture once the defendant meets its burden of production the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual") (internal citations and quotation marks omitted).

Plaintiff asserts that he has presented evidence raising a genuine issue of material fact that Defendant's proffered reasons for terminating his employment were pretexts for unlawful retaliation resulting from his assisting Rao in the Rao Litigation. Specifically, Plaintiff argues that: (1) Ruiz "targeted" him (and Rao) in the July 2013 Boat Incident, (2) Ruiz's claim that Plaintiff failed to meet his boat hours in FY 2013 and FY 2014 was false, (3) Ruiz's claim that Plaintiff failed to comply with the FY 2014 Oyster Initiative was false, and (4) Defendant treated other game wardens more favorably after they violated Defendant's policies and state law.

Plaintiff notably does not challenge in his summary judgment responses several aspects of Defendant's stated reasons for terminating his employment.[36] The Court deems Plaintiff to have abandoned a challenge to these grounds and

---

[36] For example, Plaintiff offers no evidence to refute Defendant's documented instances of his repeated failure to notify dispatch and Ruiz when he was getting on and off of the water after explicitly being instructed to do so, his insubordination, and his failure to respect TPWD's chain of command.

Defendant's reliance on them is no longer disputed.  *See Dortch v. Mem'l Hermann Healthcare Sys.-Sw.*, 525 F. Supp. 2d 849, 876 n.69 (S.D. Tex. 2007).[37] Plaintiff will be precluded from relying on these grounds as proof of pretext at trial, unless he provides in the Joint Pretrial Order persuasive legal authority that his failure to challenge these grounds in his responses to the Motion does not constitute abandonment or waiver.

Defendant contests the materiality and accuracy of Plaintiff's four contentions regarding pretext.  Construing the summary judgment evidence and possible inferences in the light most favorable to Plaintiff, the Court concludes that he has raised genuine fact issues that preclude summary judgment on certain (but not all) of Plaintiff's theories as a matter of law.  The Court addresses Plaintiff's assertions *seriatim*.

---

[37] "It is noted that [the plaintiff] did not respond to the [defendant's] arguments regarding the deficiencies in these claims.  The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal.  *Lookingbill v. Cockrell*, 293 F.3d 256, 264 (5th Cir. 2002) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 747 n.16 (5th Cir. 2000); *Johnson v. Puckett*, 176 F.3d 809, 814 (5th Cir. 1999)).  By analogy, failure to brief an argument in the district court waives that argument in that court." *Id.*

### a.   Impact of the July 2013 Boat Incident

Ruiz listed the July 2013 Boat Incident as one of three reasons for Plaintiff's "needs improvement" rating in the FY 2013 performance review.[38]   Plaintiff's purported "boating while intoxicated" ("BWI") detection inadequacies also were mentioned in his FY 2014 performance review in the "Overall Ratings Comments"[39] and "Learning or Development Goal"[40] sections.   Plaintiff contends that he was treated unfairly in connection with this incident, because he claims he did nothing wrong and that he was not counseled about it until three months later, after he gave a deposition in the Rao Litigation.   It is undisputed that Plaintiff was never suspended or demoted because of the incident.

The record is muddy, however, regarding the connection between the July 2013 Boat Incident and Plaintiff's firing.   The LOI and the Termination Memorandum could be construed implicitly to refer to the July 2013 Boat Incident.

---

[38]   The other two reasons were the December Time Log Incident and Plaintiff's insubordinate comments to Warden Stakes regarding Ruiz.

[39]   *See* FY 2014 Performance Review [Doc. # 41-1], at ECF 74 ("Warden Newman displays a skill level well below that of a Game Warden of his tenure and in certain areas of his job displays levels of incompetence and inability (BWI, PRT).")

[40]   *See id*. at ECF 75 ("Warden Newman will be paired up with Wardens that are more proficient in BWI enforcement and commercial oyster enforcement so as to assist and help Warden Newman become more capable and competent at the aspects of the BWI process, commercial oyster enforcement and his duty regarding those initiatives.").

Moreover, Defendant's articulated a related concern about Plaintiff's proficiency in detecting BWI violations in his FY 2014 performance review.  In an exercise of caution, the Court concludes that there is a genuine factual dispute whether Plaintiff acted improperly regarding the July 2013 Boat Incident and/or whether he lacked BWI proficiency.  A factfinder at trial must decide whether (a) Plaintiff would not have been counseled or given an overall "needs improvement" rating in his FY 2013 review based on the July 2013 Boat Incident but for a retaliatory motive, and (b) if so, whether this incident played a significant part in the decision to terminate his employment at the end of FY 2014.  Summary judgment is denied on the issue of the impact of the July 2013 Boat Incident.

### b.    Boat Hour Requirements in FY 2013 and FY 2014

Plaintiff next contends that Ruiz falsely stated in Plaintiff's FY 2014 performance review and the LOI that he failed to meet the required 300 hours of boat patrol time in each of FY 2013 and FY 2014, as well as failed to meet his boat patrol obligations under the FY 2014 Oyster Initiative.  Plaintiff asserts further that Defendant's decision to terminate his employment based, at least in part, on this false premise supports a reasonable inference that Defendant's stated grounds for discharging him were a pretext for unlawful retaliation.

*FY 2013.*—Plaintiff denies that he failed to meet the 300 boat hour minimum in FY 2013.  According to Plaintiff, his total boat hours for that period

were 305 hours.  In support of his assertion, Plaintiff offers his own declaration and copies of photographs of what Plaintiff's counsel claims in his briefing are Plaintiff's monthly time sheets for FY 2013 and FY 2014 ("Time Sheet Images"). Defendant challenges the admissibility of the Time Sheet Images because of lack of authentication.  *See* FED. R. EVID. 901(a).  Defendant is correct.  With one exception, there is no mention of Plaintiff on any of the Time Sheet Images and no indication that he is the subject of each of the time sheets.  No witness explains the source of or otherwise authenticates these documents to demonstrate each sheet is what counsel claims.  *See id.*  Neither Plaintiff nor any witness provides testimony describing specifically how the Time Sheet Images support Plaintiff's boat time contentions.  Despite Defendant raising this issue months ago, Plaintiff has not sought leave to supplement to record to address the omission.  The Time Sheet Images accordingly are not admissible in evidence.

Plaintiff's conclusory averments in his affidavit of his total number of hours worked on the water are merely unsupported representations.  Accordingly, Plaintiff has not raised a genuine fact issue on falsity regarding Defendant's belief that he failed to meet the department's requirement that each game warden spend 300 hours each fiscal year engaged in boat patrol.  Summary judgment is granted in Defendant's favor on the issue of Plaintiff failing to meet the requirement that he perform 300 hours of boat patrol in FY 2013.

*FY 2014.*—Plaintiff acknowledges that he did not meet the 300 boat hour requirement for FY 2014 or satisfy the requirements of the FY 2014 Oyster Initiative.[41]   He contends his failure to do so was excusable because he was on medical leave for approximately eight weeks during the review period.  There is no dispute that Plaintiff took at least 32 days of leave pursuant to the Family Medical Leave Act between late-April 2014 and early-June 2014.  Defendant responds that when Plaintiff was at work, he failed to take actions to ensure that he would complete his required 300 boat hours.[42]   Plaintiff has not introduced any evidence of Defendant's FMLA policies or cited law that FMLA leave for 8 weeks excuses satisfaction of seminal job performance requirements, such as the general boat patrol and the FY 2014 Oyster Initiative requirements.

Plaintiff also argues that he could not meet the FY 2014 hours because his work vessel was taken away from him and he had significant difficulty getting on the water with other wardens or in other vessels.  This contention fails to raise a genuine fact issue.  Ruiz acknowledged that he took Plaintiff's boat away in FY

---

[41]   *See* Plaintiff Declaration [Doc. # 48-4], ¶ 22 ("For 2014, Ruiz claimed that I had 218 hours and that I missed the requirement by over 80 hours.  In fact, I had 255 hours for the year-not the 218 hours claimed by Ruiz.").

[42]   For example, Plaintiff did not record *any* boat hours in December 2013 or April 2014.  Plaintiff does not cite any evidence that he was unable to engage in boat patrols in December 2013 or on other days in April 2014 that he apparently reported to work.

2013, but testified without contradiction that he assigned Plaintiff a new boat in shortly thereafter in FY 2013.  Moreover, Plaintiff does not contest Defendant's evidence that despite being assigned his own boat, he did not submit a single boat fuel purchase receipt in either FY 2013 or FY 2014.  Plaintiff also has not supplied any documentation that he complained to Ruiz or other superiors about the impact of his claimed inability to find a boat to use for patrols.  Plaintiff thus has failed to raise a genuine fact issue that his admitted failure to satisfy either the FY 2014 300 boat hour requirement or the FY 2014 Oyster Initiative boat patrol mandate was excusable.

Defendant thus is entitled to summary judgment on the issue that Plaintiff failed to satisfy the boat hours requirement in both FY 2013 and 2014, and he may not challenge as false or pretext this aspect of Defendant's explanation for the decision to terminate his employment.

### c.      Disparate Treatment Theory

Finally, in his Response, Plaintiff contends that Defendant treated him far less favorably than other game wardens who committed serious misconduct, and that such disparate treatment is evidence of pretext.  In support of his position, Plaintiff cites solely treatment of game warden Chris Fried.  According to Plaintiff, Fried was merely temporarily suspended, rather than terminated, when Defendant discovered that he was attempting to claim workers compensation benefits for an

injury he incurred while he was off-duty and hunting illegally without a permit. Plaintiff argues that because his purported misconduct and performance deficiencies do not approach the level of severity of Fried's actions, the disparity in the discipline is evidence that his discharge was the result of unlawful retaliatory intent.

Defendant opposes Plaintiff's reliance on evidence relating to Fried. Defendant contends that it is far too late for Plaintiff to raise for the first time in this case a "comparator/disparate treatment theory" in response to the summary judgment motion.   Defendant establishes without contradiction that Plaintiff neither pleaded a comparator/disparate treatment theory in his Complaint, nor asserted such a theory before the EEOC in his Charge of Discrimination, nor disclosed Fried or any related information (such as Fried's supervisor or the officers that investigated Fried's injury) in initial disclosures or discovery (*i.e.*, his interrogatory answers or his deposition).   Defendant complains that Plaintiff's reliance on treatment of Fried at this time causes prejudice because discovery closed four months before Plaintiff asserted this new comparator theory[43] and no discovery on that theory was conducted.   Defendant's arguments have merit.   It is far too late in this litigation for Plaintiff to raise a new and distinct theory of

---

[43]     The discovery deadline in this case was, by agreement, November 30, 2017. Amended Docket Control Order [Doc. # 29].

liability against Defendant.[44]  *See Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 415–16 (5th Cir. 2015) ("[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.")  (quoting *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *see also Hoffman v. L & M Arts*, 838 F.3d 568, 576 (5th Cir. 2016) ("a district court considering a defendant's motion for summary judgment does not err by disregarding a theory of liability asserted in the plaintiff's response that was not pleaded as required by the applicable pleading standard.").

---

[44]  Even if Plaintiff had provided Defendant timely notice of this disparate treatment theory of retaliation and supported that claim with admissible evidence, Plaintiff's argument would lack merit.  "To establish disparate treatment, [a plaintiff] must show that [the defendant] gave preferential treatment to another employee under 'nearly identical' circumstances." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).  "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Heggemeier v. Caldwell Cty., Texas*, 826 F.3d 861, 868 (5th Cir. 2016) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)).  "On the other hand, '[e]mployees with different supervisors, who work for different divisions of a company or . . . who have different work responsibilities . . . are not similarly situated.'" *Id.* (quoting *Lee*, 574 F.3d at 259-260).  Plaintiff plainly fails to satisfy his burden with regard to Fried.  Plaintiff cites no evidence that he and Fried shared the same supervisor or had "essentially comparable violation histories."  The summary judgment record thus is devoid of evidence that Fried was treated more favorably than Plaintiff under "nearly identical" circumstances.  Plaintiff's argument of pretext based on Defendant's alleged disparate treatment between Fried and Plaintiff fails on the merits.

Plaintiff may not assert a disparate treatment theory in support of his claim of retaliatory discharge.

## IV.   <u>CONCLUSION AND ORDER</u>

Defendant is entitled to summary judgment on most but not all factual issues pertaining to Plaintiff's claim of retaliation.  There remain factual issues for trial as explained in this Memorandum and Order.

Plaintiff has not presented direct evidence that his firing was the result of unlawful retaliation.  Plaintiff has not raised a genuine fact issue on whether he met his "on the water" boat hours for FYs 2013 and 2014, and he is not permitted to raise an untimely theory of disparate treatment.  However, there remain questions of fact whether Plaintiff engaged in any wrongdoing in connection with the July 2013 Boat Incident, whether Defendant criticized Plaintiff's conduct during that incident because of his assisting Rao throughout the Rao Litigation, and whether Defendant would have fired Plaintiff irrespective of that incident.

It is therefore

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 41] is **GRANTED IN PART AND DENIED IN PART.**  Defendant is entitled to summary judgment on the issue of whether its stated ground for terminating Plaintiff based on his failure in FYs 2013 and 2014 to meet his required boat hours was a pretext for unlawful retaliation.  Defendant also is entitled to summary

judgment with respect to Plaintiff's comparator/disparate treatment theory of retaliation. However, summary judgment is **denied** on the issue of whether the July 2013 Boat Incident is evidence that Defendant's stated grounds for terminating Plaintiff was a pretext for retaliatory conduct. It is further

**ORDERED** that Defendant's objections to the Letter [Doc. # 49], the Time Sheet Images [Doc. # 48-3], and Plaintiff's evidence relating to game warden Chris Fried [Docs. # 48-15 – 48-24] are **GRANTED**. The Letter, the Time Sheet Images, and all evidence relating to game warden Chris Fried are inadmissible at trial. It is further

**ORDERED** that Defendant's remaining evidentiary objections will be decided at Docket Call or a hearing pursuant to Federal Rule of Evidence 104 prior to trial. It is further

**ORDERED** that Plaintiff's counsel is **WARNED** that **no further extensions of deadlines** will be permitted unless agreed by Defendant in writing in advance of the deadline. Failure by Plaintiff's counsel to comply with applicable deadlines will result in the striking of untimely filings or denial of the relief requested.

SIGNED at Houston, Texas, this 6th day of **June, 2018**.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

P:\ORDERS\11-2016\2626MSJ.docx